## TOM GARDNER v. THE STATE.

### No. 1775. Decided December 7, 1898.

**1. Juror—Qualification—Opinion Formed.**

It is not every opinion formed that disqualifies a juror; to do so, the opinion must be a fixed one. A juror is not disqualified who states that, notwithstanding his opinion, he can give defendant a fair and impartial trial, and that his verdict would not be in the least affected by his opinion.

**2. Murder—Manslaughter.**

On a trial for murder, where the evidence in one phase of it suggested that defendant went to the place of difficulty on a peaceful mission to settle the trouble between deceased and himself, and deceased, being the aggressor, struck him a blow causing pain or bloodshed, and his passion was thereby excited and he then formed the intent to slay deceased and did so, he would only be guilty of manslaughter.

**3. Manslaughter—Adequate Cause—Test of.**

Penal Code, article 700, defines what is adequate cause. It says: "By the expression adequate cause is meant such as would commonly produce a degree of anger, rage, sudden resentment, or terror, in a person of ordinary temper sufficient to render the mind incapable of cool reflection." This is the statutory test, and when the court submits this test in the charge it has gone quite far enough.

**4. Same—Charge of Court—Temper and Courage.**

Where the court in its charge upon manslaughter, instead of the characterization of the person mentioned in the above statutory test, used the expression, "in a person of ordinary temper *and courage,*" Held, the charge is erroneous. Temper and courage are too different things. A man of ordinary temper might become excited with passion long before a man of courage would be, under the same circumstances, and to authorize the jury to regard defendant not only as a man of ordinary temper, but as a man of courage, was charging an additional requisite on which to base the defense of manslaughter than is required by the statute.

**5. Charge of Court—Sufficiency.**

A charge of court should always define and state matters of law pertinent to the case on trial, and the rules of law should be applied to the particular state of facts proved.

APPEAL from the District Court of Van Zandt. Tried below before Hon. W. J. GRAHAM, on exchange with Hon. J. G. RUSSELL.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

Appellant was indicted for the murder of Will Swain, on the 14th day of March, 1898, by shooting him with a pistol.

Ike Lawler, the only eyewitness to the homicide, testified: "I know the defendant. I knew Will Swain; he is dead. Tom Gardner killed him. I was present and saw him killed. On the 14th day of March, 1898, I went by where defendant was working in a new ground, on the same farm that I live on, and says: 'Tom, let's go over and see the old man

[meaning Mr. Gilland] run the first furrow in the new ground.' He says, 'I don't care if I do.' We went to where Mr. Gilland was plowing, and returned to where defendant had been working. I started off and defendant asked me what my hurry was. I told him I had to go to work. He then said: 'Ike, Will Swain or you one have told a damned lie about that money business.' I told him I had no money to pay fines. He said there would be no fines to pay. I then told him I would go over and get Will Swain, and we would get together and settle the matter. Will Swain had told me that defendant's father had a thousand dollars when he died; that he (Swain) had handled the money; that defendant and his brother, Jack Gardner, were buying corn on a credit, and that old lady Gardner, their mother, could furnish the money if she would do so. When I told the defendant I would go after Swain, he said, 'All right; I will go down to the bridge in the field.' We then walked on about two or three hundred yards to the bridge, and Tom stopped and said he would wait there, and I went on to where Will Swain was plowing, about 300 yards from there. I told Will Swain that Tom Gardner had jumped me again about lying. He asked me where defendant was, and I told him he was down at the bridge in the field. He then said he would go with me and meet him and settle the matter as soon as his wife came back. We waited about ten minutes, until Mrs. Swain came in sight, and then Swain dropped his traces and we started to where defendant was. When we came up to where defendant was he was sitting down by a tree. Defendant said, 'Have a seat, Will.' Swain sat down and said, 'Tom, there is a damned lie out about that money, and if you all say that your mother hasn't got a thousand dollars, you lie.' Defendant said, 'If you say that mother has got a thousand dollars you tell a damned lie.' Defendant got up, and Swain struck him in the temple with his fist. Swain then caught the defendant by the throat and chugged him against a tree two or three times. The defendant had his right hand in his pants pocket. Swain said, 'Don't you hit me with those knucks,' and at the same time drawing and opening his knife. I told them not to have that kind of a row; told defendant not to draw his knucks, and told Swain to put up his knife. He said, 'All right,' and put his knife in his pocket; and just as he was doing so, defendant told him again he was a liar; and he took his hand from his pocket and started to strike defendant again, when the pistol fired and Swain fell. Deceased had no knife in his hands when he struck. I did not see the pistol at all. I ran as soon as Swain fell, and got off some distance; looked back and saw defendant running after me. He followed me some seventy-five yards or more, and then turned and went toward his home. I did not see him any more till after he was put in jail. This occurred in Van Zandt County, State of Texas, on or about the 14th day of March, 1898."

Crossed: "I went by that afternoon to see defendant, because his brother Jack had told me he wanted me to talk to Tom about going to a faith doctor to have Tom's eyes treated. Will Swain had told me that if defendant would ever agree to meet him, to let him know or come after

him, and he would go and settle the matter with him. Will Swain was a much better man physically than the defendant. I understand that the Gardners and Swains came to this county together from Limestone County, last winter."

A number of witnesses testified that defendant had a good reputation for peace and quietude where he had been living.

*T. R. Yantes,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of fifteen years; hence this appeal.

As explained by the court, there is nothing in appellant's bill of exceptions questioning the action of the court in regard to the impanelment of the jury. It is not every opinion formed that disqualifies a juror. In this case none of the jurors had any fixed opinion as to the guilt or innocence of appellant. The only one that appears to have entertained any opinion on this subject at all stated that he could give appellant a fair and impartial trial, and that his verdict would not in the least be affected by his opinion. It appears that full opportunity was given appellant to probe this juror as to his opinion, and the channel through which same was formed.

In the motion for a new trial appellant excepted to the following charge of the court: "If you believe from the evidence in this case that the deceased, Will Swain, made an attack upon the defendant, and inflicted upon him blows, and the manner of the attack, coupled with his acts and conduct at the time, was such as to produce in the mind of the defendant a degree of anger, rage, or sudden resentment or terror, such as rendered his mind incapable of cool reflection, and that such state of mind would thereby have been commonly produced in a person of ordinary temper and courage, and in such state of mind, so produced, if it was, the defendant shot with a pistol, and thereby killed, the deceased, Will Swain; and you should further believe that in killing the deceased, if he did kill him, the defendant was not justifiable under the rules of self-defense, about which you will be charged hereinafter,—then the defendant would be guilty of manslaughter." Appellant objected to this charge upon two grounds: First, that the court erected an ideal standard by which to test the defendant's passion, whereas the jury should have been instructed to view this matter only from the defendant's standpoint; and, further, that the standard erected was not authorized by statute, the statute only requiring that appellant be tried as to the issue of manslaughter as a person of ordinary temper, and not as a person of ordinary temper and courage. We have examined the record carefully, in order to determine whether or not a charge on manslaughter should have been given at all, and we believe there is one phase of the case which

suggested this issue; that is, if appellant went to the place where the difficulty occurred, on a peaceful mission, to endeavor to settle the trouble between him and deceased, and the deceased became the aggressor, and first attacked him, and struck him a blow or blows, which caused him pain or bloodshed, and his passion was thereby excited, and he then formed the intent to slay Swain, and did so, then, and in such case, he would only be guilty of manslaughter. As the issue of manslaughter was raised, it was the duty of the court to give a correct charge on this subject. The statute (Penal Code, article 700) uses this language: "By the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." The statute erects this standard to test the effect of the adequate cause on the defendant's mind, and it is competent for the court to lay down this test; but when it has done this it has gone quite far enough, and it is not proper to incumber the defendant on this issue with an additional burden. "Courage" is not the same thing as "temper." "Temper" means "disposition of mind; as inclination to give way to anger, resentment, or the like." "Courage" means "that quality of mind which enables one to encounter dangers and difficulties with firmness, or without fear or depression of spirits; valor, boldness, bravery," etc. A man may be a person of mild and agreeable temper or disposition, capable of patience and forbearance, with coolness under great insults or provocation; and yet he may be a man of great courage, or vice versa. As we understand it, temper and courage are two different things. A man of ordinary temper might become excited with passion long before a man of courage would be, under similar circumstances; and to lay down a rule going beyond the statute authorizing the jury to regard the defendant not only as a man of ordinary temper, but as a man of courage, was charging an additional and different requisite on which to base his defense of manslaughter than is provided by statute. We think this was error.

In regard to the charge of the court we would remark that, in our opinion, the charge is too general. While a court should always define and state matters of law pertinent to the case on trial, the rules of law so defined should be applied to the particular state of facts proved. The charge here given embraced murder in the first and second degrees, manslaughter and self-defense, following the form given by Judge White, and is general enough to cover almost any case which involves these phases. But the jury were not instructed adequately on the crucial point in this case. So far as the State's case is concerned, the facts suggest the subject of mutual combat. If the parties met at the bridge for the purpose of engaging in a mutual combat, or if that was the purpose which actuated the defendant in going there, and he waited for his adversary (the deceased) to come, then his right of self-defense would be entirely cut off. If, on the other hand, defendant did not go to the bridge for the purpose of engaging in a difficulty, but for the purpose of settling the dispute between him and deceased in a peaceable and

friendly manner, and the deceased was the aggressor, and made the first assault on him, in such manner as to cause him to reasonably believe that his life was in danger, or his person in danger of serious bodily injury, then his right of self-defense was complete. If, however, the attack on him was not such as to reasonably cause him to believe that his life was in danger, or his person in danger of serious bodily injury, he would have a qualified right of self-defense,—that is, he would be authorized to use all the force necessary to repel the assault being made on him, —and in such case would only be responsible for the use of more force than was reasonably necessary. The questions above discussed are not raised, and we only make these observations in view of another trial. The judgment is reversed and the cause remanded.

*Reversed and remanded.*